

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-2003

# Miller v. Rite Aid Corp

Precedential or Non-Precedential: Precedential

Docket No. 02-2464

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Miller v. Rite Aid Corp" (2003). *2003 Decisions.* Paper 392.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/392

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 30, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2464

ANTHONY MILLER,
                                    Appellant

v.

RITE AID CORPORATION

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 00-cv-4938)
District Judge: Hon. William H. Yohn, Jr.

Argued: April 3, 2003

Before: MCKEE, SMITH, *Circuit Judges*, and
HOCHBERG, *District Judge*.*

(Filed June 30, 2003)

                    Gerald S. Berkowitz, Esq. (argued)
                    625 B Swedesford Road
                    Swedesford Corporate Center
                    Malvern, PA 19355-1530

* Honorable Faith Hochberg, United States District Court for the District
of New Jersey, sitting by designation.

Robert A. Klein, Esq.
Conrad, O'Brien, Gellman & Rohn
1515 Market Street, 16th Fl.
Philadelphia, PA 19102-9620

*Attorneys for Appellant*

A. James Johnston, Esq.
Jonathan B. Spraque, Esq. (argued)
Post & Schell, P.C.
1800 J.F.K. Blvd., 19th Fl.
Philadelphia, PA 19103

*Attorneys for Appellee*

---

## OPINION OF THE COURT

SMITH, *Circuit Judge*.

Anthony Miller, formerly an executive for the Rite Aid Corporation ("Rite Aid"), appeals the District Court's decision, after a non-jury trial, that Miller lacked standing to bring a claim against Rite Aid pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Because Miller was never laid off, the District Court found that Miller: (1) is not, and never was, eligible to receive the severance benefits he sought through his civil suit; and (2) is no longer employed by Rite Aid and therefore has no prospect of becoming eligible to receive those severance benefits. Accordingly, the District Court concluded that Miller was not a "participant" authorized to bring a civil action pursuant to § 502(a)(1) of ERISA. We agree, in substance, with the District Court, but will remand the matter to the District Court to enter an order consistent with Miller's lack of standing.

**I.**

In September of 1999, the Rite Aid Corporation began experiencing financial difficulties. As a result, Rite Aid began to lay off employees at its corporate headquarters. In the reshuffling of personnel which accompanied these lay offs, Miller, then a senior executive at Rite Aid, became the

Corporate Director of Store Planning and began reporting directly to Mark White, Rite Aid's Vice-President of Store Development. Later that fall, a new management team decided to further restructure Rite Aid's operations. Thus, in March of 2000, White, then Miller's boss and friend, submitted to Rite Aid's senior management a proposal to restructure his department. As part of the restructuring, the plan included a list of additional employees that White proposed to lay off. The plan provided that laid off employees would receive a severance package. That initial plan did not include Miller.

Later that March, Miller discussed with White the possibility of being added to the list of employees whose severances White would be proposing to management. Miller had begun negotiations to join a company in Arizona called U.S. GlobalNet, an internet start-up which was developing certain software products. Pursuant to Miller's request, White added Miller to the list of employees proposed to be severed. Senior Rite Aid management gave final approval to White's restructuring plan in late May of 2000. As part of that plan, White had complete discretion "as to the timing and order of the lay off of each individual whose severance was approved by senior Rite Aid management."

On June 1, 2000, Miller and GlobalNet orally agreed to employment terms, later entering into a written agreement at the end of that month. On June 6, White told Miller that management had agreed to include Miller in the restructuring plan and informed coworkers that Miller would be leaving. White did not, however, provide Miller with any official severance date. White did begin to otherwise implement the restructuring plan, and some, but not all, of the employees listed in the plan were, in fact, laid off that first week in June.

The next day, June 7, 2000, Larry Haller, the Director of Retail Facilities, who reported directly to Miller, tendered his written resignation effective June 23, 2000. Although White and Miller expected this resignation eventually, it occurred earlier than both anticipated. Thus, in response to the short-staffing that Haller's resignation caused White in Miller's area, White had to suspend plans to sever Miller.

When White explained to Miller what had happened, Miller "volunteered" to stay on at Rite Aid to manage Rite Aid's facilities department during the restructuring period. White did not provide Miller with any affirmative date or estimate as to when he might be severed. Nonetheless, Miller contacted his new prospective employer, GlobalNet, and arranged to start with that company on July 31, 2000.

From June 9, 2000 through July 2, 2000, Miller and White exchanged e-mails regarding Miller's departure and his entitlement to severance. On June 14, 2000, in response to an e-mail from Miller, White told Miller that he would receive his severance package when he was laid off. However, because of staffing shortages, White explained that he could neither afford to lay Miller off at that time nor commit to an affirmative date as to when he could let Miller go. White wrote, "As soon as I can let you go, I will. And you will get a handsome package to take with you (assuming you stay around long enough to get it of course)!"

On June 26, 2000, Miller asserted to White in an e-mail that his "final date is July 28th and my 9 months of severance needs to start from there." On July 2, White responded to Miller that he could not guarantee Miller a specific severance date, nor would he agree to a severance date just because Miller had unilaterally accepted another job. White wrote:

> The idea that being laid off and getting a severance package is somehow a "right" that you have is preposterous. I have been telling you all along that your employment is still active and that I don't know when that situation will change. If you choose to take your family somewhere other than Harrisburg, it is your choice. If you leave on July 28, it will be because you resigned not because you were being laid off. You will leave without a severance package.

On August 7, 2000, Miller, still working for Rite Aid, sent White an e-mail asking, "Will I get a package if I stay until the end of August — whether there is a replacement or not?" White responded that Rite Aid only gives severance packages when an employee is laid off. In Miller's case,

White stated that it was not only unnecessary to lay him off, it was "virtually impossible" given the staffing shortages in the department.

Finally, on August 18, 2000, Miller resigned from Rite Aid, effective immediately. The District Court found that "[a]t the time Miller resigned, he was aware that his severance benefits would not vest until his employment at Rite Aid was severed." The District Court found that "Rite Aid never severed Miller's employment," further noting that "[t]here are employees listed on the severance list approved in May 2000 that continue to be employed by Rite Aid."

On September 29, 2000, Miller filed a two-count complaint against Rite Aid in the United States District Court for the Eastern District of Pennsylvania. Miller asserted claims to the severance benefits he contends Rite Aid promised him based on state law breach of contract and wrongful denial of benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). In seeking summary judgment, Rite Aid admitted that its severance plan was a welfare benefit plan subject to the provisions of ERISA. Therefore, Rite Aid contended that ERISA would preempt Miller's contract claim. Nonetheless, Rite Aid also argued that because Miller was not an ERISA "participant," he had no standing to bring an ERISA claim. In opposition to summary judgment, Miller contended that he was an ERISA "participant," and therefore had standing to bring that claim; however, Miller *agreed* that his state law claim was preempted. On that basis, the District Court granted summary judgment to Rite Aid on the state law contract claim, but held the ERISA claim over for trial.

After a non-jury trial on the "merits" of the ERISA claim, the District Court concluded that Miller was not a "participant," as defined by 29 U.S.C. § 1002(7); therefore, "Miller lacks standing to bring an ERISA action for unpaid benefits under the severance plan." The District Court issued an Order of Judgment in favor of Rite Aid. Miller subsequently filed a notice of appeal with respect to "the final order entered in favor of the Defendant on May 21, 2002," but, notwithstanding the District Court's judgment against him on the ERISA claim, did not appeal the earlier grant of summary judgment on his state law contract claim.

The District Court asserted jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), and 1367. This Court has jurisdiction over the present appeal pursuant to 28 U.S.C. § 1291. When a district court conducts a non-jury trial, we "review the District Court's findings of facts for clear error. Application of legal precepts to historical facts receive plenary review." *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 149 (3d Cir. 1999). However, "[i]t is not for us to pass upon the numerous factual and legal issues as though we were trying the cases [d]e novo. 'It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end.' " *Matter of Penn Cent. Transp. Co.*, 596 F.2d 1127, 1140 (3d Cir. 1979) (quoting *Group of Inst'l Inv. v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 564 (1943)). We have plenary review over questions of standing. *AT&T Communications of New Jersey, Inc. v. Verizon New Jersey, Inc.*, 270 F.3d 162, 168 (3d Cir. 2001).

## II.

In granting judgment for Rite Aid, the District Court concluded that Miller lacked "standing" to bring an ERISA claim because he did not meet the definition of an ERISA "participant," as defined by 29 U.S.C. § 1002(7). At oral argument, the parties conceded that this case presents no issue of traditional Article III standing, U.S. Const. art. III, § 2 ("Cases" and "Controversies"), a contention with which we agree. However, the "question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' " *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). These "judicially self-imposed limits on the exercise of federal jurisdiction are founded in concern about the proper — and properly limited — role of the courts in democratic society; but unlike their constitutional counterparts, they can be modified or abrogated by Congress." *Id.* at 162 (quotations and citations omitted).[1]

---

1. Prudential considerations of standing— i.e., whether "a plaintiff's grievance . . . arguably fall[s] within the zone of interests protected or

"The first inquiry, then, is whether Congress expressly negated [the] prudential standing doctrine in passing the [statute at issue]. In determining whether Congress intended to abrogate the background presumption that prudential standing doctrine applies, we consider the statutory text, its structure, and its legislative history." *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 227 (3d Cir. 1998); *see also Proctor & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) (citing *Bennet*, 520 U.S. at 163).

Far from abrogating the prudential standing doctrine, in past decisions, we have stated that "ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1), *restricts* civil actions against a plan administrator to actions brought by a 'participant or beneficiary.' The requirement that the plaintiff be a plan participant is both a standing and subject matter jurisdictional requirement." *Saporito v. Combustion Engineering Inc.*, 843 F.2d 666, 670-71 (3d Cir. 1988) (emphasis added), *vacated by Combustion Engineering, Inc. v. Saporito*, 489 U.S. 1049 (1989) (". . . remanded . . . for further consideration in light of *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101 . . . (1989)."); *see also Becker v. Mack Trucks, Inc.*, 281 F.3d 372, 377-79 (3d Cir. 2002) (addressing standing before "turn[ing] to the merits of their claims"); *Shawley v. Bethlehem Steel Corp.*, 989 F.2d 652, 655 n.5 (3d Cir. 1993) ("Because we hold that plaintiffs have no standing to sue under ERISA, we do not address the merits of plaintiffs' discrimination claim under

---

regulated by the statutory provision or constitutional guarantee invoked in the suit," *Bennett*, 520 U.S. at 162 — were first applied "to suits under the APA, but later cases have applied it also in suits not involving review of federal administrative action." *Id.* at 163. "[T]he breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes." *Id.* (quoting *Clarke v. Sec. Indus. Assoc.*, 479 U.S. 388, 400 n.16 (1987) (internal quotation omitted)). Rather, "Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated." *Id.*

§ 510.").[2] Thus, we have construed the language of § 502(a)(1) to provide standing for a civil action only to "a participant or beneficiary." 29 U.S.C. § 1132(a)(1). In that sense, the "zone of interest" inquiry in the prudential standing analysis for § 502(a)(1) claims is inextricably tied to the question of whether a plaintiff can meet the definitions of either a "participant" or "beneficiary." 29 U.S.C. § 1002; *see also Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1222 (5th Cir. 1992) (". . . the standing question and the merits of an employee's claim are unavoidably intertwined to some degree"); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 701 (1st Cir. 1994) ("In determining who is a 'participant,' for purposes of standing, the definition found in 29 U.S.C. § 1002(7) must be read in the context of traditional concepts of standing . . . . *The ultimate question is whether the plaintiff is within the zone of interests ERISA was intended to protect.*") (emphasis original) (original bracketing deleted).

## A.

Miller does not dispute this premise. However, Miller contends that because he *was* a "participant," he necessarily *is* a "participant" and, therefore, has standing to pursue his claim. The statutory language of ERISA does not support Miller's argument.

"The term 'participant' means any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan . . ." 29 U.S.C. § 1002(7). Miller argues that he was a

2. Most other Circuits have also held that, as with Article III standing, the question of whether a plaintiff has standing to sue under § 502 is a jurisdictional question that must be addressed prior to the merits. *See, e.g.*, *Hobbs v. Blue Cross Blue Shield of Alabama*, 276 F.3d 1236, 1240-41 (11th Cir. 2001); *Ward v. Alternative Health Delivery Systems, Inc.*, 261 F.3d 624, 626 (6th Cir. 2001); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1464 (4th Cir. 1996); *Harris v. Provident Life & Accident Ins. Co.*, 26 F.3d 930, 933 (9th Cir. 1994); *Coleman v. Champion Intern. Corp./Champion Forest Products*, 992 F.2d 530, 533 (5th Cir. 1993); *Alexander v. Anheuser-Busch Companies, Inc.*, 990 F.2d 536, 538 (10th Cir. 1993).

participant in the Rite Aid severance plan because: (1) he was on the list of employees to be laid off; (2) his severance benefit had been approved by those with authority to design the plan; (3) the plan administrator (White) had been instructed to implement the plan; (4) White began to implement the plan; and (5) Miller's lay off was announced. However, Miller's argument entirely misses a critical point: the District Court found that Miller had to be laid off to become "eligible" for severance under Rite Aid's plan. Miller was never laid off.

Miller may be correct that for a fleeting period of time he met ERISA's definition of participant; however, the District Court found that he did not meet that definition after he voluntarily left Rite Aid before the vesting of his benefits.[3] Once Miller's severance was approved by management, but before he quit, Miller technically might have been an "employee . . . of an employer . . . who . . . *may become* eligible to receive a benefit," specifically severance. 29 U.S.C. § 1002(7) (emphasis added).[4] However, Miller never actually *became* eligible; the District Court found that the plan required him to be "severed" by the company to be eligible. Instead, Miller resigned. Once Miller resigned, he then became — and remains to this day — a "former employee of an employer . . . who" *neither* "*is* or *may become* eligible to receive a benefit." *See* 29 U.S.C. § 1002(7) (emphasis added). Miller is not *presently* "eligible for benefits." The District Court found that "Rite Aid only provides severance benefits to those who are laid off." Miller also has no prospect of *becoming* eligible; he no longer works for Rite Aid, and does not allege that Rite Aid may

---

3. The District Court found that "Steven Chesney, Rite Aid's [D]irector of Corporate Human Relations, is responsible for administering lay offs at Rite Aid. Chesney Test. Only when Chesney was told of an employee's release date, did Chesney prepare a severance and release agreement for the employee. Id. Because Miller was never given a date certain for his release, Chesney did not prepare a severance package for Miller." App. 011. "At the time Miller resigned, he was aware that his severance benefits would not vest until his employment at Rite Aid was severed." App. 010.

4. The District Court made no specific findings on this point, nor did it need to.

hire him back. What Miller is now is a "former employee of an employer . . . who" *might have* "become eligible to receive a benefit." *Cf.* 29 U.S.C. § 1002(7). But § 1002(7) does not define a former employee who "might have" become eligible for benefits as a participant under ERISA. *See id.*

This reading of the definition of "participant" is consistent with both the leading Supreme Court decision and our own precedent in this area.

> In our view, the term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment," . . . or *former employees* who "have . . . a reasonable expectation of returning to covered employment" or have "a colorable claim" to *vested* benefits. . . . A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to *vested* benefits, however, simply does not fit within the [phrase] "may become eligible."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117-18 (1989) (emphasis added) (citations omitted). Thus, in *Shawley v. Bethlehem Steel Corp.*, 989 F.2d 652 (3d Cir. 1993), we stated that whether former employees are "participants" depends on whether "they have either a colorable claim to *vested* benefits in the Plan or a reasonable expectation of returning to employment at" the company. *Id.* at 656 (emphasis added). Where the benefits of those former employees had not vested prior to their leaving the company, and the employees had no recall rights to be rehired, we held that those plaintiffs were not "participants" and affirmed the district court's dismissal of the ERISA claim for lack of standing. *Id.* at 657. Similarly, the District Court found that Miller's severance benefits never vested.

Reading *Firestone Tire & Rubber*, *Shawley* and other cases interpreting the definition of "participant" to require only a "colorable" claim to vested benefits, Miller asserts that his claim was "colorable," i.e., non-frivolous; thus, he was a participant with standing to bring his claim. Miller misapprehends both *Firestone Tire & Rubber* and the doctrine of standing. We grant to Miller that his claim was

not frivolous. In fact, his claim was obviously substantial enough to require the District Judge to conduct a non-jury trial so as to resolve certain issues. Yet, therein lies the flaw in Miller's argument.

The question of whether a plaintiff is a "participant," and thereby has standing to bring a §502(a)(1) claim, is most often addressed after the filing of motions to dismiss or for summary judgment. *See, e.g., Firestone Tire & Rubber*, 489 U.S. at 107; *Becker*, 281 F.3d at 375; *Shawley*, 989 F.2d at 655; *Saporito*, 843 F.2d at 667; *Sallee v. Rexnord Corp.*, 985 F.2d 927 (7th Cir. 1993); *Molnar v. Wibbelt*, 789 F.2d 244 (3d Cir. 1986). However, the written terms of the Rite Aid severance policy at issue left ambiguous the requirements for an employee to vest in and become eligible for severance. Conflicting parol evidence at summary judgment evidently required a trial to settle that question. Nonetheless, just because a plaintiff is permitted to proceed to trial on an ERISA claim does not compel the conclusion that he has standing. Standing is "not [a] mere pleading requirement[,] but rather an indispensable part of the plaintiff's case, each element [of which] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements . . . [a]nd at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

Once Miller's purported claim was brought to trial, it was no longer simply a question of whether Miller could make out a non-frivolous or "*colorable* claim to vested benefits." *Firestone Tire & Rubber*, 489 U.S. at 118 (emphasis added); *Shawley*, 989 F.2d at 656. Miller had to prove "by the evidence adduced at trial" that he actually met the definition of participant. *See Lujan*, 504 U.S. at 561. The "colorable" language in the decisions Miller cites is not part of a generic *legal* test for meeting the definition of "participant," but is reflective of the minimal evidentiary

production demanded of a plaintiff to avoid summary judgment.[5] *See Christopher*, 950 F.2d at 1221 ("*Firestone* [cannot] be read to reduce the standing question to a straightforward formula applicable in all cases."). While we have noted that the "zone of interest" inquiry for § 502(a)(1) claims is tied to whether a plaintiff meets the definition of a "participant or beneficiary," at trial, these two inquiries are nearly coextensive.[6] As in *Shawley*, without having vested in the benefits at issue, "plaintiffs could show no likelihood of success in a suit for benefits." 989 F.2d at 657; *see also Becker*, 281 F.3d at 379 ("a legally unenforceable claim to *contingent* benefits cannot establish a colorable claim to *vested* benefits under *Firestone*.") (emphasis in original). Thus, Miller's status as a "participant," and thereby his standing to properly assert his purported ERISA claim, depends upon whether the District Court properly found that Miller did not become eligible for severance benefits.

## B.

While Miller has claimed to be solely concerned "with the District Court's Conclusions of Law concerning Miller's 'participant' status," Miller has implicitly disagreed with the District Court's *factual* finding that Rite Aid's severance plan required Miller to actually be laid off before Miller would be "eligible to receive [that] benefit." *See* 29 U.S.C. § 1002(7). If Miller is correct, and Miller was vested in his severance benefits when, as he contends, White announced Rite Aid's plans to sever him, Miller would meet the definition of "participant" in § 1002(7) and be entitled to pursue a § 502(a)(1) claim. However, after a non-jury trial, we "review the District Court's findings of facts for clear

---

5. Requiring a plaintiff to establish a colorable claim to vested benefits at the motion to dismiss or summary judgment stage is a standard commensurate with "the burden of proof, *i.e.*, with the manner and degree of evidence required, at [those] successive stages of the litigation." *See Lujan*, 504 U.S. at 561.

6. The required elements for traditional Article III standing are obviously separate from prudential standing requirements. *Compare Bennett v. Spear*, 520 U.S. 154, 162 (1997), *with Lujan*, 504 U.S. at 560-61.

error." *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 149 (3d Cir. 1999).

Based on testimony and exhibits at trial, the District Court found that "Rite Aid employees who resign before Rite Aid severs their employment do not receive any severance benefits. . . . Miller voluntarily resigned," and "Rite Aid never severed Miller's employment." Thus, the District Court found that Miller was not "an employee entitled to benefits nor is he able to establish that he may become eligible under the severance plan." Applying these *factual* findings, the District Court read 29 U.S.C. § 1002(7) to draw an appropriate *legal* conclusion: "Miller is not a qualified ERISA participant."

Miller premises many of his arguments on factual findings that were never made by the District Court and which the record does not support. Specifically, Miller's brief claims he "was included in the Rite Aid severance plan and had a future right to benefits." Miller also asserts, "It was never contemplated in the context of the unwritten Rite Aid severance plan, that Miller had to be laid off to attain participant status." Despite these assertions, the record indicates otherwise.

The District Court never found that Miller "had a future right to benefits." To the contrary, the District Court explicitly found that Miller was not "entitled to benefits," and never was, because "Rite Aid only provides severance benefits to those who are laid off." Certainly, the possibility of future benefits existed, but Miller never obtained a vested "right" to those benefits.[7] Furthermore, Miller's assertion that "[i]t was never contemplated . . . that Miller had to be laid off to attain participant status" is a legal conclusion premised on factual issues resolved against him: whether he was, in fact, "eligible to receive a benefit." *See* 29 U.S.C. § 1002(7). In his brief, Miller essentially admits that he was never "eligible" to receive severance benefits. *See, e.g.,* Appellant's Br. at 14 ("Miller's resignation prior to his lay

---

7. ERISA defines "vested liabilities" as those owed to "participants and their beneficiaries which are nonforfeitable." 29 U.S.C. § 1002(25). "The term 'nonforfeitable'" means the benefit "is *unconditional*, and which is legally enforceable against the plan." *Id.* § 1002(19) (emphasis added).

off may be important to the question of *whether he was eligible* for benefits under the plan . . ." ) (emphasis added); *id.* at 15-16 ("When Miller's lay off and severance was approved . . . he *would have* met the eligibility requirements of the severance plan in the future, i.e., *upon his layoff. . .*") (emphasis added); Reply Br. at 3 ("Miller *had to be laid off to qualify* for his severance benefit . . .") (emphasis added). Thus, his claim that he was a "participant" is without foundation.

Miller has failed to point to any evidence in the record that indicates that the District Court's findings regarding the terms of the severance plan are "clear error." *In re Unisys Sav. Plan Litig.*, 173 F.3d at 149. In fact, Miller's brief essentially acknowledges that the District Court's most critical factual findings were correct. Applying those facts to the definition of "participant" in § 1002(7), we conclude that Miller does not meet that definition.

## III.

Miller did not stay at Rite Aid long enough to be laid off and thereby become eligible for severance benefits. Because he voluntarily resigned, there is no possibility of his becoming eligible for severance in the future. ERISA does not define a "former employee of an employer . . . who" might have "become eligible to receive a benefit" as a "participant" entitled to sue. Therefore, having failed to establish that he meets the definition of an ERISA "participant" in 29 U.S.C. § 1002(7), Miller had no standing to bring a claim against Rite Aid pursuant to ERISA, and the District Court was without jurisdiction to rule on Miller's purported claim.[8] Nonetheless, rather than dismiss Miller's claim for want of jurisdiction, the District Court entered judgment in favor of Rite Aid on that claim. We therefore vacate that Order and remand this case to the

---

8. For this reason, we do not reach the issue of whether Miller's supervisor, White, was properly acting as an "employer," and not a "fiduciary," when he declined to fire Miller.

District Court with instructions to dismiss Miller's ERISA claim.[9]

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

9. On remand, the District Court is free to consider the implications, if any, of this decision on any issues that may remain related to the state law claim.